# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

MEREDITH BACEWICZ,
  *Plaintiff*,

  v.

MOLECULAR NEUROIMAGING, LLC,
  *Defendants*.

Case No. 3:17-cv-85-MPS

## RULING ON DEFENDANT'S MOTION TO DISMISS

The Plaintiff, Meredith Bacewicz ("Bacewicz"), filed this action against her former employer, Molecular Neuroimaging LLC ("MNI"), claiming MNI terminated her in retaliation for reporting fraudulent conduct by MNI and efforts to stop MNI from continuing such conduct. Bacewicz alleges (1) retaliation in violation of the False Claims Act under 31 U.S.C. § 3730(h); (2) retaliation in violation of Conn. Gen. Stat. § 31-51m; and (3) retaliation in violation of Conn. Gen. Stat. § 31-51q. MNI moves to dismiss all counts for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6). For the reasons discussed below, the motion to dismiss is DENIED.

## I. Background

The following facts are drawn from the second amended complaint (ECF No. 46) and are accepted as true for the purpose of deciding MNI's motion to dismiss.

Plaintiff Meredith Bacewicz worked for MNI as an Image Processing Associate from April 18, 2016 to October 24, 2016. (ECF No. 46 at ¶ 9.) Bacewicz holds an M.S. in neuroscience and had experience working in clinical research prior to her employment at MNI.

(*Id.*)  Defendant MNI is a division of inviCRO LLC, a "neuroimaging company specializing in large scale brain imaging clinical research and drug development for neurodegenerative and neuropsychiatric disorders." (*Id.* at ¶ 10.)  MNI's principal place of business is in New Haven, CT and its co-founders, Doctors Ken Marek and John Seibyl, currently manage MNI.  (*Id.*)

MNI provides services related to clinical research studies and drug development and is typically responsible for "receiving and/or performing human brain scans, processing those scans, and reporting the resultant statistical data."  (*Id.* at ¶¶ 31-32.)  MNI conducts both independent research and collaborates with global pharmaceutical and biotech companies.  (*Id.* at ¶ 33.)  Bacewicz contends that many of these companies contract with U.S. government agencies such as the National Institute of Health ("NIH").  (*Id.*)  Bacewicz asserts that through work with such companies MNI receives "funds from both public and private sources." (*Id.*)

Bacewicz began working at MNI on April 18, 2016.  (*Id.* at ¶ 9.)  Bacewicz worked in the Imaging Services group, and her direct supervisor was the Assistant Director of Image Processing and Analysis, Heather Ovens ("Ovens").  (*Id.* at ¶ 34.)  Bacewicz's job responsibilities included "analyzing, interpreting and processing MRI, PET and CT scans of the brain relevant to a number of clinical studies researching Alzheimer's disease."  (*Id.* at ¶ 36.)  In August 2016, eight Image Processing Associates, including Bacewicz, worked under Ovens.  (*Id.* at ¶ 37.)  One of these associates was Kyle LoPresto ("LoPresto") the "SPECT Processing Manager, and a Sr. SPECT Processing Associate."  (*Id.*)  Bacewicz processed about ten to forty scans per day and estimated that each scan cost between $250 to $500, but the price of such scans varied significantly.  (*Id.* at ¶ 38.)

Bacewicz began training in spring 2016.  (*Id.* at ¶ 39.)  As part of her training, Bacewicz reviewed "Standard Operating Protocols and Working Instruction Documents" but alleges that

the documents were often ignored or inaccurate.  (*Id.*)  Bacewicz claims she was "instructed to cross off and add steps, and sometimes ignore pertinent documents altogether."  (*Id.*)  When she asked if she should take notes on the changes so the documents could be updated, she was told not to bother.  (*Id.*)  During her second week of training, Bacewicz was called into Ovens' office.  (*Id.* at ¶ 40.)  Ovens discussed Bacewicz's "questioning [of] changes made to MNI protocols and working documents and pointing out the discrepancies with Sponsor protocols."  (*Id.*)  Bacewicz was told she was "'undermining people's authority'" and that she was "too new to ask such questions."  (*Id.*)  Ovens informed Bacewicz that "asking such questions was unprofessional and 'not part of the culture [at MNI].'"  (*Id.*)  Bacewicz states that she "maintained her stance on the documents but agreed to be more tactful in her questioning."  (*Id.*)  Bacewicz also claims that MNI was "emphatic that employees should not put anything in writing related to complaints or observed errors."  (*Id.* at ¶ 41.)  She was told that if she had a complaint, she should "bring it to the appropriate person.  Don't put it in email because the FDA can read that."  (*Id.*)  In June 2016, Bacewicz was cleared to begin processing images.  (*Id.* at ¶ 42.)  At her ninety-day review, Bacewicz received high praise and her only area of development appeared to be expanding her knowledge of processes and increasing the number of studies she was working on.  (*Id.* at ¶ 86.)

Bacewicz claims that MNI committed multiple forms of research misconduct including: failure to follow sponsor protocols, failure to implement and follow standardization practices, changing specific brain scan imaging processing steps, data manipulation and fabrication, and enrolling subjects with exclusionary conditions.  (*Id.* ¶¶ 66-74.)  Bacewicz contends that this misconduct rendered results useless and that if the study sponsor knew of the misconduct, it would not have paid MNI for the results.  (*Id.* at ¶ 77.)  Bacewicz reported these concerns to peers, LoPresto, Ovens, and the Director of Human Resources.  (*Id.* at ¶¶ 39, 53, 61, 69, 102,

105, 120.)  MNI dismissed Bacewicz's concerns, telling her "that's how it's done here," "that's Eli Lilly's problem," "that's how all businesses operate in Connecticut," and "that's not our concern."  (*Id.* at ¶ 91.)  When MNI did not address her concerns, Bacewicz avoided working on the impacted scans whenever practicable.  (*Id.* at ¶ 89.)

Bacewicz provides examples from three studies to illustrate MNI's misconduct.  The A4 Study began in 2013 and was sponsored by the National Institute on Aging (an NIH institute), Eli Lilly and Company ("Lilly"), and several philanthropic organizations.  (*Id.* at ¶ 45.)  MNI was contracted to perform image processing analysis and determine whether potential participants were eligible for enrollment in the study.  (*Id.* at ¶ 46.)  The study specifically dictated that "linear warping" was to be used when performing the "brain normalization" step during image processing.  (*Id.*)  "Warping" is an image processing step where images are altered ("warped") to fit a standard template brain.  (*Id.*)  This normalization step serves multiple purposes in clinical studies including standardizing scans to allow researchers to identify commonalities and differences between subjects and groups, allowing results to be reported in a standard coordinate system, accounting for individual differences in brain size and shape, and ensuring that a given region in a subject's brain corresponds to the same region in another subject's brain.  (*Id.*)  Once a warping procedure has been chosen, it must remain consistent throughout the study so that the results are valid.  (*Id.*)  The normalized results, produced using the chosen warping procedure, are used to generate statistical data called standardized uptake values ("SUVs") for each image.  (*Id.* at ¶ 47.)  SUVs are then used to determine eligibility for the study and are a "key ongoing measurement of drug effectiveness." (*Id.*)

In 2014, MNI changed the study protocol from linear warping to nonlinear warping without informing the study sponsor.  (*Id.* at ¶ 48.)  Bacewicz and others were initially instructed

"verbally and through work instruction documents to use nonlinear warping as standard practice and to use linear warping only if nonlinear normalization failed." (*Id.*) Because of this change, ineligible subjects were enrolled and "ongoing data collected from enrolled subjects was fatally compromised." (*Id.* at ¶ 49.) According to Bacewicz, this resulted in the data being rendered "worthless" because a second unaccounted for variable was introduced and it was now impossible to determine which variable—the drug or the warping—was responsible for the results. (*Id.*)

In June 2016, Lilly became aware of MNI's failure to follow protocol. (*Id.* at ¶ 50.) Lilly directed MNI to reanalyze every scan in accordance with the original warping protocol. (*Id.* at ¶ 51.) Lilly wanted MNI to show that "only a small percentage of subjects were wrongfully enrolled as a result of the switch." (*Id.*) During a meeting, Ovens emphasized that MNI's "financial future was at risk if they could not make that showing." (*Id.*) Ovens also sent an email to staff further stating that as a result of the failure to follow protocol MNI could "potentially lose critical contracts with Lilly" and that the founder had deemed the incident "the worst thing that has happened in the history of MNI." (*Id.* at ¶ 97.) MNI did not, however, reanalyze each scan correctly. According to Bacewicz, MNI began using "various data manipulation tactics" to show that subjects were correctly deemed eligible and to "make it seem not as bad." (*Id.* at ¶ 52.) MNI aimed to show that fewer than 5% of subjects were wrongfully enrolled. (*Id.* at ¶ 98.)

MNI utilized a number of data manipulation tactics. MNI used "masked linear warping" which changes the SUVs generated. (*Id.* at ¶ 53.) Bacewicz asked LoPresto about the technique and he told her that "it didn't affect their values as much as we'd hoped." (*Id.*) Bacewicz also asked Ovens "whether Lilly knew about the effect of masks," but received no answer. (*Id.*)

MNI changed other parameters until it achieved the desired eligibility status. (*Id.*) Bacewicz claims that contracts and other documents she reviewed state that that MNI would use standardized parameters, but that staff was encouraged to change these parameters as they saw fit to improve the "look" of the scan and "sometimes with the express intention of affecting subject eligibility status during the reanalysis." (*Id.*)

Instead of the "mode used for individual processing," MNI used "batch mode" analysis to re-analyze multiple scans at once, which generated different SUVs. (*Id.*) Bacewicz raised the issue that batch mode generates different SUVs and affects eligibility with LoPresto but was told the discrepancy was a "rounding error" and "it's not a big difference." (*Id.*) Ovens informed Bacewicz that the batch mode process was validated, but Bacewicz noted that she never received working instruction documents or protocols confirming the validation. (*Id.*)

MNI used different parameters than what was required in the study when analyzing data. (*Id.*) The original Working Instruction Document dictated that MNI use linear parameters saved as "NLW_Off" (nonlinear warping off). (*Id.*) However, MNI changed the parameters to "NLW_On" without permission in 2014, which caused Lilly to order the reanalysis. (*Id.*) Instead of returning to "NLW_Off," MNI instructed Bacewicz and others to use other files in place of "NLW_Off" including a second version of "NLW_Off" that was saved in a different server location. (*Id.*) When Bacewicz compared the results of the identically named "NLW_Off" files, she found that they generated different data. (*Id.*) The second version of "NLW_Off" was created after the order to reanalyze and had been modified several times. (*Id.*) Bacewicz claims this was likely an attempt to reach the desired eligibility status. (*Id.*)

MNI also submitted data under false subject IDs. If other methods did not produce the desired result, MNI would sometimes "substitute data acquired from another subject." (*Id.*) MNI

changed file names and audit trails were altered. (*Id.*) Bacewicz believes that ineligible participants were enrolled in the study because MNI signed off on the scans as "expected." (*Id.* at ¶ 54.) These ineligible participants allegedly possessed brain abnormalities in structure and blood flow that would have been identifiable in brain scans performed by MNI. (*Id.*) Bacewicz contends that MNI exposed subjects to unnecessary potential harm by deeming them eligible for the study. (*Id.*) She also alleges that the data manipulations and fabricated scan data was an effort to conceal the number of wrongfully enrolled subjects so MNI could save time and money and could cover up its failure to follow sponsor protocols. (*Id.* at ¶ 73.)

The LZAX study began in 2010 and required the exclusion of "subjects with confounding neurological conditions." (*Id.* at ¶ 57.) Bacewicz observed that MNI listed a patient who was missing a significant portion of brain matter as "expected," leading to his enrollment in the study. (*Id.* at ¶ 59.) MNI's Managing Director, Dr. John Siebyl, allegedly agreed that the subject "likely does not meet study criteria." (*Id.*) Bacewicz emailed LoPresto to discuss the subject's scan and was told to discuss the issue in his office, which Bacewicz contends was to conceal the error from sponsors and government officials. (*Id.* at ¶ 61.) In October 2016, Bacewicz noticed the subject was still enrolled in the study and contact LoPresto again, but to her knowledge the subject still has not been removed. (*Id.* at ¶ 120.) Bacewicz asserts that MNI was financially motivated to enroll rather than exclude subjects because in some instances, payment was impacted by the number of enrolled subjects, and in ongoing studies, more subjects meant more future billable scans. (*Id.* at ¶ 75.)

The AC Immune clinical trial was sponsored by NIH, AC Immune, and private organizations. (*Id.* at ¶ 62.) During the course of the study, a likely technical issue caused regions of the brain to be cut off in images of two subjects. (*Id.* at ¶ 63.) Because the scans were

incomplete, both subjects should have been deemed unevaluable; however, after multiple reviews, both were passed as "expected." (*Id.*)

Bacewicz objected to the misconduct she observed in the above-mentioned studies. On August 3, 2016, Ovens met with Bacewicz about reports that Bacewicz appeared unhappy. (*Id.* at ¶ 100.) Ovens moved the meeting to the office of the Human Resources Director, Laura Collins ("Collins"). (*Id.*) Ovens then explained that she had received complaints that "Bacewicz [was] suspicious of things her coworkers or superiors say and [she] doesn't follow directions." (*Id.*) Ovens also told Bacewicz that a question every so often is a good thing, but that she should not get "hung up on little things" and "should just accept the answers she is given." (*Id.*) When Bacewicz asked for examples of what Ovens wanted her to change, Ovens could not provide an answer except that she should "try not to be so suspicious." (*Id.* at ¶ 101.) Two days after this meeting Bacewicz asserts that Ovens and others began retaliating against her. (*Id.* at ¶ 103.) Bacewicz reports that Ovens moved Bacewicz's desk to a cold, dark corner, cancelled meetings with her, limited her access to data and information necessary to perform her job, and did nothing when others made derogatory remarks towards her. (*Id.*)

On August 30, Bacewicz reported her concerns to the FDA's Office of Scientific Integrity ("OSI"). (*Id.* at ¶¶ 106-07.) On September 1, Bacewicz overheard two coworkers saying Seibly had talked to FDA OSI. (*Id.* at ¶ 108.) Later the same day, Bacewicz spoke with FDA OSI representatives about MNI's conduct and sent FDA OSI details concerning patients and protocols by email. (*Id.* at ¶ 109.) After her report, Bacewicz states that there was a "dramatic increase of hostility in her MNI work environment." (*Id.* at ¶ 111.) Bacewicz reported that Ovens "avoided and shunned her," canceled meetings with her, and assigned her "less interesting and more mundane" work. (*Id.*) Bacewicz alleges that when she had lunch with

a co-worker, Ovens "hovered" outside the office. (*Id.*) Bacewicz claims that the escalation shows that MNI knew she was responsible for the FDA OSI reporting. (*Id.* at ¶ 112.)

In mid-September, Bacewicz discovered that data for two patients in the A4 study were identical. (*Id.* at ¶ 113.) At first Bacewicz refused to analyze the data, until a colleague brought up the skipped scan with her the next day. (*Id.*) Upon further review, Bacewicz learned that the audit trail, which is designed to stop submissions of incorrect data, had been erased, which directly violated the Imaging Review Charter for the A4 study. (*Id.* ¶¶ 114-115.) Bacewicz overheard coworkers discussing her investigation into the A4 study and saying how she was "stupid to do this because it made Ovens mad." (*Id.* at ¶ 116.) Bacewicz believed this meant that Ovens was monitoring her computer activities and was aware of her efforts to prevent research misconduct. (*Id.*)

On October 3, 2016, Bacewicz had a one-on-one with Ovens but was provided no feedback. (*Id.* at ¶ 118.) On October 14, 2016, Bacewicz was instructed that she had to use a spreadsheet to convert pounds to kilograms. (*Id.* at ¶ 121.) Bacewicz emailed her objections to Ovens, stating that half her team did not even have the spreadsheet and questioning whether the policy only applied to her. (*Id.*) On October 19, 2019, Bacewicz met with Ovens and Collins. (*Id.* at ¶ 123.) Ovens told Bacewicz she was "out of line" by questioning whether the spreadsheet policy applied only to her. (*Id.*) She also questioned Bacewicz about the lunch with her coworker and told her she needed approval to speak with others outside her team. (*Id.*) Finally, Ovens criticized Bacewicz for leaving early one day, even though Ovens had previously approved the request. (*Id.*) On October 24, 2016, Bacewicz again met with Ovens and Collins and was terminated. (*Id.* at ¶ 125.) When Bacewicz asked for a reason, Ovens referenced "fit" and that she "failed to establish good relationships with her supervisors and had a lack of respect

for MNI's policies and procedures." (*Id.*) Ovens also referenced the "spreadsheet thing, then the white matter thing earlier," which Bacewicz contends referred to her reporting related to the patient with the missing brain matter. (*Id.*)

On January 20, 2017, Bacewicz commenced suit against MNI for violations of the False Claims Act and retaliation under federal and state law. (ECF No. 1.) Pursuant to 31 U.S.C. § 3730(h), the United States moved to seal the complaint. (ECF No. 3.) The United States later declined to intervene in the case and moved to unseal the compliant. (ECF No. 9.) Bacewicz amended her complaint to remove the FCA claim, leaving in place her federal and state retaliation claims. (ECF No. 46.) MNI moves to dismiss all counts of the complaint for failure to state a claim under Rule 12(b)(6). (ECF No. 48.)

## II. Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). In considering such a motion, the court must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). To survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010). "When a complaint is based solely on wholly conclusory

allegations and provides no factual support for such claims, it is appropriate to grant defendants['] motion to dismiss." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

## A. False Claims Act Retaliation

"The FCA is a statutory scheme designed to discourage fraud against the federal government. It authorizes private citizens to sue on behalf of the United States to recover treble damages from those who knowingly make false claims for money or property upon the Government or who knowingly submit false statements in support of such claims or to avoid the payment of money or property to the Government." *Lawrence v. Int'l Bus. Mach. Corp.*, 2017 WL 3278917, at *17 (S.D.N.Y. Aug. 1, 2017) (quoting *United States ex rel. Lissack v. Sakura Glob. Capital Mkts., Inc.*, 377 F.3d 145, 146 (2d Cir. 2004)). Violations of the FCA occur when an individual or organization "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729. A claim is defined as "any request or demand, whether under a contract or otherwise, for money or property . . . that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2). The word

material is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

The False Claims Act further provides that "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). To state a retaliation claim under 31 U.S.C § 3730(h), courts in this Circuit have generally required a plaintiff to show that "(1) [she] engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against [her] because [she] engaged in the protected activity." *United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017). Plaintiffs do not need to meet the heightened pleading standard of Rule 9(b) because an FCA retaliation claim "does not require a showing of fraud"; rather, "the emphasis of the claim is on the employee's protected action and whether the employer retaliated against the employee because of that action." *Mendiondo v. Centinela Hosp. Medical Center*, 521 F.3d 1097, 1103 (9th Cir. 2008); *see also Chorches*, 865 F.3d at 95 ("The particularity requirement of Rule 9(b) does not apply to retaliation claims under the FCA.").

### 1. Bacewicz Engaged in Protected Conduct

An employee bringing an FCA retaliation claim must first show that she was engaged in protected conduct. *Chorches*, 865 F.3d at 95. Protected conduct includes (1) "lawful acts done . . . in furtherance of an action [under the FCA]" and (2) "other efforts to stop 1 or more

violations of this subchapter." 31 U.S.C. § 3730(h). Courts have interpreted the first category to include "investigations, inquiries, testimonies, internal reporting, objecting to employer directives, or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, 2017 WL 2636037, at *10 (D. Conn. June 19, 2017) (internal quotation marks and citations omitted). Within the second category of protected conduct, "a retaliation claim can be stated so long as the employee was engaged in efforts to stop an FCA violation, even if the employee's actions were not necessarily in furtherance of an FCA claim." *Malanga v. NYU Langone Med. Ctr.*, 2015 WL 7019819, at *3 (S.D.N.Y. Nov. 12, 2015). Courts in this circuit have found that "complaining of regulatory violations may qualify as an 'effort [] to stop 1 or more violations' of the FCA." *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 299 (E.D.N.Y. 2016). The Second Circuit has also held that simply refusing to participate in a fraudulent scheme can constitute "efforts to stop 1 or more violations" of the FCA. *Chorches*, 865 F.3d at 96-98.

A Plaintiff is not required to file an FCA claim, *Faldetta v. Lockheed Martin Corp.*, 2000 WL 1682759, at *12 (S.D.N.Y. Nov. 9, 2000), or even be aware that her investigation could lead to an FCA claim to be protected from retaliation under the statute, *United States ex rel. Mooney v. Americare, Inc.*, 2013 WL 1346022 at *9 (E.D.N.Y. Apr. 3, 2013). "[I]t is enough to show that [a plaintiff's] investigation reasonably could have led to a[n] FCA action." *Dhaliwal v. Salix Pharm., Ltd.,* 752 F. App'x 99, 100 (2d Cir. 2019) (internal quotation marks and citations omitted); *see also Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 ("[FCA retaliation provision protects] an employee's conduct even if the target of an investigation or action to be filed was innocent."); *United States ex rel. Karvelas v. Melrose-*

*Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004) ("Protected activity [for purposes of an FCA retaliation claim] should . . . be interpreted broadly." (quoting S. Rep. No. 99-345, at 34 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5299).). "To determine whether an employee's conduct [is] protected under the FCA, courts must evaluate whether (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Ortiz v. Todres & Co., LLP*, 2019 WL 1207856, at *4 (S.D.N.Y. Mar. 14, 2019) (internal citations and quotation marks omitted).

Bacewicz has plausibly alleged that she engaged in "investigations, inquiries, . . . internal reporting, [and] objecti[ons] to employer directives" which "reasonably could have led to a[n] FCA action" or "other efforts to stop" an FCA violation. For example, after Lilly discovered that MNI had used nonlinear warping on the A4 study and directed MNI to reanalyze the data to ensure that only a small percentage of the participants had been erroneously enrolled, Bacewicz alleges that MNI engaged in various data manipulation practices. (ECF No. 46 at ¶ 50-51.) Most egregiously, Bacewicz alleges that MNI submitted data acquired from one subject under the ID of another subject, all to make it appear that more of the enrolled subjects were eligible for the study. (*Id.* at ¶ 52-53.) Bacewicz alleges she "raise[d] questions about . . . the observed submission of data under false subject IDs . . . ." (ECF No. 46 at ¶ 91.) Repeatedly, Bacewicz was reprimanded for asking too many questions and being too "suspicious." (*See, e.g.*¸ ECF No. 46 at ¶ 100-01.) She further alleges that she contacted the FDA to report that MNI had been "manipulating and fabricating data in a variety of ways." (ECF No. 46 at ¶ 107.) Bacewicz also alleges that she took affirmative steps to investigate the alleged violations by, for example, reviewing a "file's audit trail to figure out what may have caused the discrepancy and try to stop the submission of the incorrect data." (*Id.* at ¶ 114.) She also alleges she refused to review a

scan she believed had been manipulated.  (*Id.* at ¶ 113.)  These actions constitute protected conduct under the FCA.

MNI argues that the conduct Bacewicz was investigating concerned mere violations of internal protocol, and not fraud.  But Bacewicz specifically alleges that MNI was falsifying data for monetary gain.  For example, Bacewicz alleges that MNI was in danger of losing its contract with Lilly for the A4 study as a result of its failure to follow protocol.  (*See* ECF No. 46 at ¶ 97 ("We could, as a result, also potentially lose critical contracts with Lilly who is one of our biggest customers.").)  In an effort to retain the contracts, Bacewicz alleges that MNI submitted manipulated and even fabricated data.  More generally, Bacewicz alleges that MNI manipulated and fabricated data to make ineligible subjects appear eligible because MNI was sometimes paid based on the number of enrolled subjects.  (ECF No. 46 at ¶ 75.)  This conduct could reasonably have led to an FCA claim under 31 U.S.C. § 3729(a)(1)(B), which prohibits knowingly making or causing to be made "a false record or statement material to a false or fraudulent claim." Importantly, Bacewicz need not adequately allege all the elements of an FCA claim—only conduct that could reasonably lead to one.  *Dhaliwal*, 752 F. App'x at 100; *see also Bland-Collins v. Howard Univ.*, 19 F. Supp. 3d 252, 258 (D.D.C. 2014) (finding that a reasonable jury could conclude that the plaintiff had engaged in protected conduct when she investigated and documented data inconsistencies in a study sponsored by the federal government).

MNI cites *Sikorsky* in support of its argument, but there, the court found that the plaintiff's investigations were exclusively aimed at improving the quality of Sikorksy's products, and there was no indication in the complaint that his investigations were designed to expose "fraud."  *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, 2017 WL 2636037, at *10 (D. Conn. June 19, 2017).  "Fraud" is generally defined as "[a] knowing misrepresentation or

knowing concealment of a material fact made to induce another to act to his or her detriment."
Black's Law Dictionary (10th ed. 2014). Here, Bacewicz alleges that MNI manipulated and
fabricated data—in effect making false representations—to make ineligible subjects appear
eligible and thus induce payment. The element of "fraud" that was missing in *Sikorksy* is thus
present here.

MNI also appears to argue that Bacewicz's retaliation claim fails because she was not
aware of MNI's billing practices and contractual arrangements and thus cannot show an adequate
nexus to government funds. (ECF No. 52 at 3.) The FCA's definition of "claim" extends to
those made to "a contractor, grantee, or other recipient, if the money or property is to be spent or
used on the Government's behalf or to advance a Government program or interest, and if the
United States Government . . . provides or has provided any portion of the money or property
requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii). The definition is decidedly not limited
to claims made directly to the federal government, and the language of the provision plainly
provides for a broad scope. *See, e.g.*, *United State ex rel. Grubea v. Rosicki, Rosicki &
Associates, P.C.*, 318 F. Supp. 3d 680, 705-07 (holding that claims submitted to Fannie Mae and
Freddie Mac, which received substantial government bailout funds, are "claims" within the
meaning of the FCA, even though they are independent for-profit companies). Moreover,
Bacewicz need not plead facts supporting an FCA claim in this respect; she need only allege that
her investigations, reports, and objections related to conduct that could have reasonably led to an
FCA claim. Here, Bacewicz alleges that the relevant studies were funded, at least in part, by the
federal government. (*See, e.g.*, ECF No. 46 at ¶¶ 16, 45, 92.) One does not need an in depth
understanding of the specific flow of government funds to reasonably believe that claims related

to a study receiving federal funds would fall under the FCA's broad definition of a "claim." I thus find that her allegations are adequate in this respect.[1]

## 2. MNI Was Aware of Bacewicz's Conduct

An employee bringing an FCA retaliation claim must further show that the employer was on notice of the employee's protected activities. *Weslowski v. Zugibe*, 626 Fed. Appx. 20, 22 (2d Cir. 2015). Without evidence of knowledge, a plaintiff cannot show retaliatory intent. *Lawrence*, 2017 WL 3278917 at *7. Courts in this district have adopted the standard that "an employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a qui tam action against it." *United States ex rel. Smith v. Yale University*, 415 F. Supp. 2d 58, 105 (D. Conn. 2006). "The standard for notice is 'flexible': the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged." *Lawrence*, 2017 WL 3278917 at *7 (internal quotation marks and citations omitted). "All that Defendant must have known is that Relator was engaged in protected activity—that is, investigation or other activity concerning potentially false or fraudulent claims that reasonably could lead to an FCA case." *Smith*, 415 F. Supp. 2d at 105.

When all reasonable inferences are drawn in her favor, as they must be at this stage, Bacewicz has adequately alleged that MNI was aware of her protected conduct. Much of her alleged protected activity involved reports to her superiors, of which they can be presumed to have been aware. Bacewicz alleges that she made "consistent statements to Ovens [her supervisor], Director of Human Resources . . . Collins, and her peers . . . [that] the unapproved protocol changes and data manipulation schemes that MNI directed the Image

---

[1] As discussed above, retaliation claims do not need to meet the high pleading standards of rule 9(b). *Chorches*, 865 F.3d at 95.

Processors to follow were unethical, misleading, fraudulent, and likely illegal." (ECF No. 46 at ¶ 89.) She alleges that she "continued to raise questions," including about "the observed submission of data under false subject IDs." (*Id.* at ¶ 91.) In response, Bacewicz claims Ovens reprimanded her. In a meeting between Bacewicz, Ovens, and HR Director Collins, Ovens admitted that Bacewicz's work was "good," but told her she should "try not to be so suspicious." (*Id.* at ¶¶ 100-01.) In an email to Collins, Bacewicz complained that she was "at a loss as to how and when to [ask] questions, as I don't think my questions were frivolous or that I am needlessly 'suspicious' of what I'm told. Sure, some questions might have been uncomfortable—especially those related to misleading data or patient safety—but in those scenarios a solid explanation would go a long ways in easing my fears." (*Id.* at ¶ 105.)

Bacewicz also alleges that she wrote to the FDA that MNI "instructed employees . . . to use various tactics with the explicitly stated goal of making it seem like fewer people were wrongfully enrolled in studies," and that MNI "manipulat[ed] and fabricat[ed] data in a variety of ways" and "fraudulently enrolled subject[s]." (*Id.* at ¶ 107.) Two days later, she alleges that she overheard colleagues saying that Managing Director Seibyl had talked to the FDA that morning. (*Id.* at ¶ 108.) Immediately after her report to the FDA, Bacewicz alleges a "dramatic increase of hostility in her MNI work environment." (*Id.* at ¶ 111.) Drawing all reasonable inferences in Bacewicz's favor, as the Court must at this juncture, Bacewicz has plausibly alleged that MNI knew of her report to the FDA.

MNI argues that to sustain a retaliation claim, Bacewicz must have told MNI that she was specifically concerned about fraud. (ECF No. 52 at 8-9.) To the extent that MNI implies that a relator must make any explicit disclosures to her employer, the Court is aware of no authority for such a claim. *United States ex rel. Smith v. Yale University*, which MNI cites in support of its

proposition, makes this clear. "All that Defendant must have known is that Relator was engaged in protected activity—that is, investigation or other activity concerning potentially false or fraudulent claims that reasonably could lead to an FCA case." *Smith*, 415 F. Supp. 2d at 105.

Relatedly, MNI argues that Bacewicz's conduct concerned deviations from internal study protocols, rather than "fraud," and that MNI thus could not have been aware she was investigating possible fraud. But although some of Bacewicz complaints and investigations may have begun as concerns about violations of study protocols, as events unfolded, her concerns expanded to more plainly fraudulent conduct. By the time Bacewicz was allegedly investigating and complaining about the manipulation and fabrication of data intended to make ineligible subjects appear eligible, assuage Lilly's concerns, and maintain MNI's funding, including by reporting her concerns to the FDA, MNI would have been on notice that her conduct concerned possible fraud, and not simply "deviati[ons] from internal study protocols" (ECF No. 52 at 9).[2]

### 3. Bacewicz Was Terminated in Retaliation for Her Conduct

Finally, the employee must show that her termination was retaliation for her protected conduct. *Chorches*, 865 F.3d at 95. Courts within the circuit have interpreted this prong to establish a "but-for" causational requirement. *See Lawrence,* 2017 WL 3278917, at *7 ("[W]hile the Second Circuit has not defined the standard of causation for FCA retaliation claims, the Supreme Court has clarified that the term 'because of' typically 'imports, at a minimum, the traditional standard of but-for causation.'").

---

[2] It is true that Bacewicz's reports often appeared more concerned with the potential adverse health effects of the unnecessary scans and treatments that ineligible subjects would undergo than the impact of MNI's misconduct on the government's purse. (*See, e.g.*, ECF No. 46 at ¶ 107.) But the Court is aware of no authority for the proposition that a motive to protect health or safety somehow spoils an otherwise well-pled retaliation claim. MNI cites *Adiram v. Catholic Gaurdian Services*, but there, the Court found that "Plaintiffs' well-pleaded allegations concern *only* health and safety, and not fraud against the government." 2015 WL 5706935, at *5 (E.D.N.Y. Sept. 28, 2015) (emphasis added). Here, Bacewicz has plausibly alleged that her conduct related to not only health and safety, but also fraud, as detailed above.

Bacewicz has alleged sufficient facts to support an inference of causation.  Bacewicz

alleged protected activities in at least the months of August and September of 2016.  For

example, on August 30, she submitted her complaint to the FDA, which she plausibly alleges

MNI knew of.  (ECF No. 46 at ¶ 106.)  In mid-September, she continued to investigate data

manipulation in the A4 study.  (ECF No. 46 at ¶¶ 113-14.)  She alleges she overheard coworkers

commenting that she was "stupid to do this because it made Ovens mad," from which it can be

reasonably inferred that Ovens knew of the investigatory activity.  (*Id.* at ¶ 116.)  Bacewicz was

terminated on October 24, about a month later.  At the motion to dismiss stage, temporal

proximity between protected conduct and an employee's termination can be sufficient to support

an inference of retaliatory intent, *see, e.g.*, *Garcia v. Aspira of N.Y., Inc.*, 2011 U.S. Dist. LEXIS

41708, at *16 (S.D.N.Y. Apr. 13, 2011), as long as the proximity is "very close." *Dhar v. City of

New York*, 655 Fed. Appx. 864, 865-66 (2d. Cir. 2016) (finding that a two-year gap between the

protected conduct and the alleged retaliation did not support an inference of retaliatory intent);

*see also United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 300

(E.D.N.Y. 2016) (finding the temporal connection sufficient when an employee engaged in

protected activities and was terminated four months later).  Here, the temporal proximity

between Bacewicz's alleged protected conduct and her termination is sufficiently close to

support an inference of retaliatory intent.

Moreover, Bacewicz alleges numerous additional facts supporting an inference of

retaliatory intent.  For example, Bacewicz alleges many facts indicating that Ovens was

displeased with her investigatory activities and complaints.  (*See, e.g.*, ECF No. 46 at ¶ 101

(Ovens told Bacewicz to "try not to be so suspicious); *id.* at ¶ 116 (indicating Bacewicz's

investigatory activities "made Ovens mad").)  Bacewicz also plausibly alleges that at least some

of the reasons Ovens gave for her termination were pretextual.  She alleges, for example, that Ovens told her that she was terminated in part for questioning the need for using a specific spreadsheet for converting pounds to kilograms, but that half the team did not even have this spreadsheet.  (*Id.* at ¶¶ 121-23, 125.)  In short, I find the above allegations sufficient to support a reasonable inference of retaliatory intent.

## B.  Retaliation under Conn. Gen. Stat. § 31-51q

MNI also moves to dismiss Bacewicz's claim that MNI retaliated against her for engaging in constitutionally protected speech.  "Section 31-51q[3] of the Connecticut General Statutes is a cause of action for violation of the right to free speech under both the United States and Connecticut Constitutions."  *Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455, 477-78 (D. Conn. 2016).  The statute has been construed to impose the same prohibitions on private employers that the First Amendment and the Connecticut Constitution impose on public employers.  *See Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 211-18 (2015).

To state a claim under Section 31-51q, a plaintiff must allege "(1) that she engaged in constitutionally protected speech, (2) that her employer took an adverse action against her, and (3) that there was a causal relationship between the protected activity and the adverse action."  *Blue v. City of New Haven*, 2019 WL 399904, at *8 (D. Conn. Jan. 31, 2019).  The statute limits its reach to cases where the protected speech "does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer."  Conn. Gen. Stat. § 31-51q.  Whether a 31-51q plaintiff must affirmatively plead

---

[3] The statute provides, in relevant part: "Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . . ." Conn. Gen. Stat. § 31-51q.

non-interference remains an open question, which no Connecticut appellate court appears to have explicitly addressed. A majority of lower courts have held that a plaintiff must affirmatively plead non-interference. *See, e.g.*, *Buscetto v. Saint Bernard School of Montville, Inc.*, 2013 WL 1111582, at *6 (Conn. Sup. Ct. Feb. 22, 2013) (citing cases); *DaSilva v. Weik*, 2018 WL 709951, at *2 (Ct. Sup. Ct. Jan. 11, 2018); *Trusz v. UBS Realty Investors*, 2010 WL 1287148, at *9 (D. Conn. Mar. 30, 2010). But a substantial minority has disagreed. *See, e.g.*, *Matthews v. Department of Public Safety*, 2013 WL 3306435, at *8-10 (Ct. Supp. Ct. May 31, 2013); *Jansson v. Stamford Health*, 2017 WL 1289824, at *11 (D. Conn. Apr. 5, 2017). As I have explained elsewhere, I find the minority view more persuasive and predict that the Connecticut Supreme Court would place the burden of proving interference on the defendant. *See Blue*, 2019 WL 399904, at *9-10 (citing *Matthews*, 2013 WL 3306435, at *8-10).

MNI argues that Bacewicz's claim fails because she spoke pursuant to her official duties, and not as a citizen. But even if this were true, it is not fatal to Bacewicz's claim. Bacewicz claims she was discharged for exercising rights protected not only by the First Amendment of the United States Constitution but also by analogous provisions of the Connecticut State Constitution. (ECF No. 46 at ¶ 133.) The Connecticut Supreme Court has established broader protection for employee speech under the Connecticut Constitution than that provided by the federal Constitution. Specifically, the Connecticut Constitution protects speech by a public employee that is a "comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety," even if the speech is pursuant to the employee's official duties. *Trusz*, 319 Conn. at 211 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 435 (Souter, J., dissenting)). Section 31-51q "extends the same protection to employee speech pursuant to official job duties in the private workplace." *Id.* at 178. Bacewicz has plausibly

alleged that she spoke out about both "official dishonesty" and "threats to health and safety." She has alleged, for example, that she wrote to the FDA that MNI was "manipulating and fabricating data" and that, as a result, "fraudulently enrolled subjects will continue to be exposed to ionizing radiation."[4]  (ECF No. 46 at ¶ 37.)  Thus, the Court need not analyze whether her actions were in the course of her official duties, as a finding against her on this question would not be fatal to her claim.

MNI further argues that the alleged speech did not pertain to matters of "public concern," and thus was not entitled to constitutional protection.  *See Trusz*, 319 Conn. at 212 ("It is only when the employee's speech is on a matter of *public concern* and implicates an employer's official dishonesty . . . other serious wrongdoing, or threats to health and safety . . . that the speech trumps the employer's right to control its own employees and policies" (internal quotation marks and citations omitted) (emphasis added)).  "A matter of public concern is one that relates to any matter of political, social, or other concern to the community." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (internal quotation marks omitted).  MNI's argument fails because Bacewicz has plausibly alleged that her speech pertained to a matter of "public concern." Bacewicz alleges that she spoke out about apparent fraud by a contractor working on a federally funded study, including the possibility that it was causing negative health repercussions for the improperly enrolled subjects.  Such speech plainly relates to a matter of "political, social, or other concern to the community."

MNI also argues that Bacewicz has failed to plead that her speech "did not substantially or materially interfere with [her] bona fide job performance or with [her] working relationship

---

[4] MNI claims in its reply that it was not aware of Bacewicz's email to the FDA.  (ECF No. 52 at 10.)  But as discussed above, Bacewicz has plausibly alleged that MNI *was* aware of it, and on a motion to dismiss, the Court must accept all plausible factual allegations, and reasonable inferences therefrom, as true.

with [her] employer," *Trusz v. UBS Realty Investors*, 2010 WL 1287148, at *9 (D. Conn. Mar. 30, 2010). MNI argues that Bacewicz's allegation that "her exercise of [her] rights did not substantially or materially interfere with her bona fide job performance or working relationship with her employer" (ECF No. 46 at ¶ 133) is a mere legal conclusion. Bacewicz replies that "a number of facts set forth in the Amended Complaint make that allegation plausible." (ECF No. 51 at 30.)

As discussed above, I adopt the minority position placing the burden to show interference with the defendant, and Bacewicz thus need not plead non-interference. But even she was required to do so, Bacewicz has alleged sufficient facts to make her allegation of non-interference plausible. She has alleged, for example, that even after she began speaking out about her concerns, at the same meeting that Ovens told her that she should "try not to be so suspicious," Ovens nonetheless admitted that her "actual work" was "good." (ECF No. 46 at ¶ 100.) Her complaint thus includes plausible factual allegations supporting her claim that her exercise of her rights did not interfere with her "bona fide job performance." (*Id.*) Bacewicz also alleges that she emailed an HR representative asking how best to raise her concerns with her superiors. (ECF No. 46 at ¶ 105 ("If you have any advice on how to politely bring it up [sic] again, I'm all ears – you're certainly better at that kind of thing than I am.").) Allegations such as these support her claim that her exercise of her rights did not substantially or materially interfere with her "working relationship with her employer." Of course, the fact that she spoke out about alleged misconduct on the part of her employer strained her relationship with her supervisor. After all, she claims she was eventually fired for it. But to hold that this precludes a retaliation claim would eviscerate the Connecticut Supreme Court's holding in *Trusz* that Section 31-51q protects employees who are discharged for commenting on "official dishonesty, . . . other

serious wrongdoing, or threats to health and safety." *Trusz*, 319 Conn. at 179. It is difficult to imagine an employee being terminated for speaking out about "official dishonesty" or "other serious wrongdoing" without the employment relationship becoming at least somewhat strained in the process. I thus find that Bacewicz's 31-51q claim would survive even if she were required to affirmatively plead non-interference.

For the above reasons, I deny MNI's motion to dismiss Bacewicz's Section 31-51q retaliation claim.

## C. Retaliation under Conn. Gen. Stat. § 31-51m

MNI moves to dismiss Bacewicz's claim under Conn. Gen. Stat. § 31-51m, which protects whistleblowers from retaliation, on the sole ground that she failed to exhaust her administrative remedies. MNI's argument fails for largely the reasons set forth in Bacewicz's brief (ECF No. 51 at 26-29), none of which MNI addresses in its reply (ECF No. 52). In short, Bacewicz has alleged that no administrative remedies are available (ECF No. 46 at ¶ 7), and MNI points to no specific authority that suggests otherwise. MNI's motion to dismiss Bacewicz's Section 31-51m retaliation claim is therefore denied.

## IV. Conclusion

For the foregoing reasons, MNI's motion to dismiss is DENIED.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
            September 23, 2019